533 A.2d 739

**Price L. ROGERS and Elaine Rogers, H/W**

v.

**JOHNSON & JOHNSON PRODUCTS, INCORPORATED and**
Lankenau Hospital and Thomas Jefferson
University Hospital.

**Appeal of JOHNSON & JOHNSON
PRODUCTS, INCORPORATED.**

Superior Court of Pennsylvania.

Argued Feb. 11, 1987.

Filed Nov. 6, 1987.

110

Alan K. Cotler, Philadelphia, for appellant.

Jim Beasley, Philadelphia, for appellees.

Before CIRILLO, President Judge * and BECK and HESTER, JJ.

* President Judge Cirillo replaced the deceased Justice Roberts.

BECK, Judge:

This case presents a difficult question regarding the parameters and application of the "malfunction theory" in a strict product liability action.

The malfunction theory has been part of the law of strict liability in Pennsylvania since 1969 when this Court decided *MacDougall v. Ford Motor Co.*, 214 Pa.Super. 384, 257 A.2d 676 (1969), *allocatur denied.* In *MacDougall,* the Court held "... that the occurrence of a malfunction of machinery in the absence of abnormal use and reasonable secondary causes is evidence of a 'defective condition' within the meaning of § 402A...." *Id.*, 214 Pa.Superior Ct. at 391, 257 A.2d at 680. Thus, the malfunction theory relieves a Section 402A plaintiff from the burden of proving a specific defect in the product. The theory permits a plaintiff to establish a prima facie case as to the first element of strict liability, existence of a defect, through circumstantial evidence of a defect consisting merely in the fact of the malfunction of the product and the absence of abnormal use or reasonable secondary causes. *Id.; Thompson v. Anthony Crane Rental, Inc.,* 325 Pa.Super 386, 395–96, 473 A.2d 120, 125 (1984), *allocatur denied.*

The primary argument of defendant-appellant Johnson & Johnson, Products, Incorporated (J & J) on appeal is that the trial court erred in submitting plaintiffs-appellees' strict liability claim, insofar as it was based on the malfunction theory, to the jury.[1] J & J asserts that appellees failed to demonstrate the absence of reasonable secondary causes as to the malfunction and urges this court to direct the entry of judgment n.o.v. in J & J's favor. Thus, the instant case calls upon us to divine precisely what the malfunction theory requires of a plaintiff who seeks to establish the absence of reasonable secondary causes.

1. J & J also raises numerous grounds for the grant of a new trial. Because of our disposition of this case on the basis of J & J's malfunction theory argument, we find it unnecessary to decide J & J's remaining contentions.

The facts giving rise to this action can be briefly summarized. The action arose out of injuries sustained by appellee Price Rogers on May 1, 1977.[2] On that date, Mr. Rogers went to Lankenau Hospital ("Lankenau") seeking medical treatment for a broken leg. The treating physicians were Dr. John J. Dowling, Chief of Orthopedic Surgery at Lankenau, and Dr. Lawrence Naame, a third-year resident at Thomas Jefferson University Hospital ("Jefferson"). Dr. Naame was on rotation to Lankenau at the time. As part of the treatment of Mr. Rogers, Dr. Dowling instructed Dr. Naame to prepare a plaster of Paris splint to support Mr. Rogers' leg until the next day when Dr. Dowling intended to operate. The plaster of Paris product Dr. Naame used, technically called Johnson & Johnson Specialist fast-setting plaster of Paris (the "plaster of Paris"), was manufactured by appellant J & J.

After Dr. Naame prepared the splint, he applied it to Mr. Rogers' leg and left the treatment room. Dr. Dowling continued Mr. Rogers' treatment for a short while. Mr. Rogers complained to Dr. Dowling of a feeling of heat being generated by the splint but Dr. Dowling assured him everything was fine and left to secure Mr. Rogers a hospital bed for the night. Shortly thereafter, Mr. Rogers began to complain again about a burning sensation under the splint. Mrs. Rogers called Dr. Dowling back to the room and it would appear that he made some further efforts to cool the splint. However, when the splint was removed the next day, second and third degree burns were discovered on the back of Mr. Rogers' leg.

In August 1978, appellees instituted this action against J & J, Jefferson and Lankenau. Neither doctor was a defendant. Appellees' complaint alternatively alleged that the J & J plaster of Paris product was defective and/or negligently designed or manufactured and that the hospital defendants were liable under a theory of respondeat superior for the negligence of the treating physicians in preparing and ap-

2. Mr. Rogers' wife is a co-appellee. She joined in her husband's action with a claim for loss of consortium.

plying the plaster of Paris. Prior to trial, counsel for appellees summarized their basic position, demonstrating that counsel relied both on strict liability and negligence:

I have evidence in this case that cuts two ways.... [A] 402A result for the plaintiff against Johnson & Johnson.... I have a burned man, Your Honor. The evidence can also show overwrapping and pillowing and dip water being too hot [evidence of medical malpractice in preparing and applying the splint], if [the jury] believe all of that, they can come back against.... Jefferson by their agent, Dr. Naame.

At first blush, this would appear to be less than extraordinary. Appellees had simply pleaded and were pursuing alternate theories of relief. However, in this case the situation was rendered somewhat more complex because of the precise nature of appellees' strict liability claim against J & J. Appellees conceded that they were unable to prove any specific defect in the manufacture or design of the plaster of Paris that would result in it overheating. Given this lack of direct evidence of defect, appellees based their strict liability claim against J & J on circumstantial evidence of a defect under the malfunction theory.[3] Appellees' re-

---

3. Appellees also pleaded a second and alternative strict liability theory based on J & J's alleged failure to warn of the dangers inherent in plaster of Paris. As in any failure to warn case, proof of this theory (like the malfunction theory) did not include any direct proof of a manufacturing defect or of any defect in the design, or chemical formula, of the plaster of Paris itself. Justice Larsen, writing in dissent in *Sherk v. Daisy–Heddon,* 498 Pa. 594, 450 A.2d 615 (1982) (Larsen, J. dissenting), explained the difference between failure to warn defects and other product defects as follows:

A defect due to a failure to warn is a defect *extrinsic* to the product itself and the adequacy of (or need for) a warning is a determination that cannot be made in a vacuum containing only the physical properties of the product. In the manufacturing or fabrication defect situation there exists an *intrinsic* flaw, blemish or imperfection of some sort which is physically demonstrable, i.e. the jury may see or touch the defective product and can compare it to a perfectly manufactured product of the same product line. However, the problem of finding a defect in a perfectly constructed product is conceptually different.

When trying to identify a defect for failure to warn or for improper design, any 'defect' becomes apparent only by additionally looking

liance on the malfunction theory to support their strict liability claim coupled with their continued desire to preserve their negligence claim against the hospitals forced appellees to adopt a novel trial strategy. Appellees were apparently aware that it was potentially problematical for them to attempt both to sustain their burden of demonstrating the absence of reasonable secondary causes of the malfunction, and thus present a prima facie case of strict liability under the malfunction theory, while also presenting compelling evidence of a possible secondary cause, namely, the medical malpractice of the doctors. Appellees apparently also knew that J & J intended to attempt to prove that the product was not defective by showing that the product had acted as it did, i.e. had overheated, solely because of the negligence of the doctors in preparing and applying the splint.[4] Faced with this dilemma, appellees decided to marshal of their evidence in favor of the malfunction theory and to leave the proof of the alleged medical malpractice to J & J. In this manner, appellees sought to have their cake (the malfunction theory) and eat it too (the negligence theory). As we will indicate in greater detail below, this appellee could not do.

At trial, appellees called Dr. Dowling himself to testify to the occurrence of a malfunction in the plaster of Paris. Dr. Dowling testified that there had been no negligence on the part of either himself or Dr. Naame and that the burning of Mr. Rogers' leg could, therefore, only be explained by a malfunction of the product caused by some defect therein. Appellant, on the other hand, produced its own expert to testify to the negligence of Drs. Dowling and Naame, both

at a configuration of elements external to the product—in the non-manufacturing/fabrication context, then, 'defect' is used in a special sense.

*Id.*, 498 Pa. at 623, 450 A.2d at 630 (emphasis supplied) (citations omitted). Appellees' failure to warn theory is not directly implicated in this appeal and we mention it only for purposes of completeness.

4. On February 4, 1983, J & J answered appellees' complaint and, in New Matter, cross-claimed against Jefferson and Lankenau pursuant to Pa.R.C.P. 2252(d). If for no other reason, J & J could be expected to put on evidence of doctor negligence in support of this cross-claim.

in preparing the splint and in treating Mr. Rogers thereafter.

The case proceeded to the jury on all of appellees' theories, the trial court having denied all of the defendants' motions for compulsory nonsuit and/or directed verdict.[5] The jury was sent out with a detailed Verdict Form which, coupled with the trial court's charge, gave the jury very specific guidance as to how its deliberations should proceed. Because of the importance of the Verdict Form to our disposition of this case, we reproduce it here:

Question 1: Was the Johnson & Johnson plaster of Paris defective as a result of malfunction?
Yes No

Question 2: Was the Johnson & Johnson plaster of Paris defective as a result of failure to warn its users?
Yes No

Question 3: If you answer "Yes" to either Questions 1 or 2, was the defect a substantial factor in bringing about the plaintiff's harm?
Yes No

Question 4: Was defendant, Johnson & Johnson, negligent?
Yes No

Question 5: If yes, was the negligence of defendant, Johnson & Johnson, a substantial contributing factor in causing plaintiff's burns?
Yes No

Question 6: Was Dr. Naame negligent?
Yes No

Question 7: If yes, was the negligence of Dr. Naame a substantial contributing factor in causing plaintiff's injuries?
Yes No

Question 8: If you answer "Yes" to Question 7,
(a) Was Dr. Naame the agent of Lankenau Hospital?
Yes No
(b) Was Dr. Naame the agent of Jefferson Hospital?
Yes No

Question 9: If you answer "Yes" to either Questions 3, or 5, or 8(a) or (b), in what amount do you find damages for plaintiff, Price

---

5. It should be noted that the trial court, after having denied Lankenau's Motion for Directed Verdict, later partially reversed itself and granted the motion only insofar as it requested a directed verdict that Dr. Dowling was not an ostensible agent of Lankenau. It was because of this ruling that the Verdict Form (discussed *infra*) contained no reference to any possible negligence by Dr. Dowling.

L. Rogers?

$_____

Question 10:  In what amount do you find damages for Elaine Rogers' loss of consortium?

$_____

Question 11:  If you answer "Yes" to Question 5 and Question 8(a) or (b), what percentage of that causal negligence do you attribute to:

Defendant Johnson & Johnson _____%

Dr. Naame _____%

Total 100%

(R. 2669–70).

The jury was instructed that if it found for appellees on the strict liability theory, it should not consider any of the appellees' remaining theories and should proceed directly to a determination of damages. Moreover, although the trial court never expressly instructed the jury that if it found that the plaster of Paris was defective under the malfunction theory, it need not determine whether the product was also defective under the failure to warn theory, this was the clear implication of the Court's charge.[6]

On February 7, 1984, the jury returned a verdict for appellees and against Johnson & Johnson only on the malfunction theory. The jury answered "Yes" to Question Nos. 1 and 3 and did not answer Question No. 2 or Question Nos. 4 through 8. In response to Question Nos. 9 and 10, the jury awarded $175,000 to Mr. Rogers and $50,000 to Mrs. Rogers on her loss of consortium claim.

The specificity of the Verdict Form coupled with the trial court's instructions provide us with a reliable guide to interpreting the jury's verdict. First, it is clear that the jury found for appellees on the malfunction theory only and did not even consider appellees' failure to warn theory. In

**6.** The trial court charged the jury:

But it's clear that you have to start with the determination of the defect, if there is a defect in the product, whether it be on the theory of malfunction or the theory of failure to warn. Once you reach that decision, once you answer yes to either question 1, 2 and 3, all the rest of the case is out, even though it's that much instruction I have to give you concerning the rest of the question, because once there's a defect, that's the only party that can be found liable. Is that clear? So you skip to 9 and 10 only. (R. 2417).

delivering the verdict, the jury foreman specifically stated that the jury had not discussed Question No. 2 relating to failure to warn. This apparently resulted from the clear implication in the court's charge that a finding of a defect could be premised on either the malfunction theory or the failure to warn theory. Second, the jury did not specifically consider the negligence of J & J since it was instructed not to do so if it found J & J strictly liable.

On the other hand, despite the fact that the jury did not specifically answer those questions relating to Dr. Naame's negligence or the responsibility of the hospitals for such negligence, the jury's verdict might also be construed as a verdict not only against J & J but also in favor of the hospital defendants. The trial court announced this to be its understanding of the verdict shortly after the verdict was returned.

J & J filed a timely post-trial motion on February 16, 1984 and asserted therein numerous grounds for the grant of judgment n.o.v. or, alternatively, a new trial. J & J later supplemented this motion on March 22, 1984. By order of the trial court dated March 6, 1986, J & J's post-trial motion was denied and this appeal followed.

J & J's major contention on appeal is made in support of its request for entry of judgment n.o.v. J & J contends that the trial court erred in submitting both appellees' malfunction theory strict liability claim and their medical malpractice claim to the jury. Actually, J & J argues that when the trial court determined that there was sufficient evidence of medical malpractice to require submission of that issue to the jury, it thereby had necessarily also determined that appellees had failed to sustain their burden of establishing a prima facie case of strict liability under the malfunction theory. J & J so reasons because, as we have previously stated, a jury will be permitted to infer that a product is defective based solely on circumstantial evidence of a malfunction only in the absence of abnormal use of the product and reasonable secondary causes for the product to have malfunctioned. *MacDougall, supra.* Under J & J's

interpretation of these requirements, a plaintiff cannot possibly have established the absence of reasonable secondary causes as to the malfunction if in fact the trial court is able to find that there is also sufficient evidence of negligence by third parties to justify submitting plaintiff's case to the jury on a negligence theory.

J & J finds compelling support for its position in *Thompson v. Anthony Crane Rental, Inc., supra.* In *Thompson,* the plaintiff was injured when the boom of a truck crane owned by one of the defendants struck high voltage wires on the premises of another of the defendants. Plaintiff's hands were resting on an iron rail being lifted by the crane when the crane struck the wires and, as a result, he suffered severe electrical burns. The *Thompson* plaintiff alleged that the owner of the crane was strictly liable because the crane was defective and the defect caused the crane to swing into the wires. Alternatively, the plaintiff alleged that the operator of the crane, an employee of the owner, negligently operated the crane and thereby caused the crane to swing into the wires. The plaintiff relied exclusively on the malfunction theory in support of his strict liability claim. The trial court submitted both the strict liability and the negligence theories to the jury, which returned a verdict in favor of plaintiff on both theories. *Id.,* 325 Pa.Superior Ct. at 390–95, 473 A.2d at 122, 123–24.

On appeal, the crane owner argued that the trial court had erred in submitting plaintiff's strict liability claim to the jury because plaintiff had failed to eliminate all possible secondary causes for the crane to have functioned as it did. *Id.,* 325 Pa.Superior Ct. at 395, 473 A.2d at 125. Although the *Thompson* Court rejected the crane owner's contention that a malfunction theory plaintiff must completely negate all possibility of a secondary cause for the malfunction of the product, the Court did require that such a plaintiff eliminate those other causes, if any, as are fairly suggested by the evidence. *Id.* (quoting *Lenkiewicz v. Lange,* 242 Pa.Super. 87, 363 A.2d 1172 (1976) (plurality)). *See also Woelfel v. Murphy Ford Co.,* 337 Pa.Super. 433, 436, 487

A.2d 23, 24 (1985) (prima facie case under malfunction theory requires a showing of malfunction and elimination of other reasonable causes); *Ocean Barge Transport Co. v. Hess Oil Virgin Islands Corp.,* 726 F.2d 121, 124–25 (3d Cir.1984) (malfunction theory plaintiff must negate other reasonable explanations for malfunction).

Applying that standard to the case before it, the *Thompson* Court concluded that the trial court had erred in submitting the case to the jury on the malfunction theory. The Court held it was reversible error for the trial court to submit the malfunction theory to the jury where the evidence of a reasonable secondary cause, i.e. the negligence of the crane operator, was sufficient to permit a theory of liability based on that cause to go to the jury. *Id.,* 325 Pa.Superior Ct. at 395, 473 A.2d at 125. In other words, as appellant has correctly stated in its brief, *Thompson* establishes that "reasonable secondary causes cannot be both a jury question and have been 'eliminated' at the same time." Brief for Appellant at p. 16.

That this was in fact the fundamental reason underlying the *Thompson* decision is beyond question. The Court specifically stated:

> [The] [trial] court erred in submitting the instant case to a jury on a malfunction theory of strict liability. *Our conclusion results from the recognition that the [trial] court also found sufficient evidence to present this case to the jury on Plaintiff's theory of negligence by the operator.*
>
> . . . .
>
> in cases like the instant one, where the plaintiff's strict liability case depends not upon the actual proof of a defect, but only upon the mere occurrence of a malfunction, it is inconsistent to permit him to proceed on the strict liability ground where he also advances a theory of human intervention which purportedly caused the harm.

*Id.*, 325 Pa.Superior Ct. at 395–96, 473 A.2d at 125 (emphasis added).

Appellant persuasively argues that the instant case is directly controlled by *Thompson.* As in *Thompson,* appellees included both theories of malfunction liability and of negligence based on the human intervention of the doctors. Moreover, as in *Thompson,* here the trial court found that there was sufficient evidence in support of both theories to allow both to go to the jury. On these bases, the legal analog between the cases is compelling.

Appellees, on the other hand, contend that their evidence in support of the malfunction theory was sufficient to present a jury question. Appellees see their burden as having been simply to come forward with enough probative evidence that the malfunction of the product was not caused by any "non-defect" factors reasonably suggested by the evidence to enable a jury reasonably to find that the malfunction was caused by a defect. Moreover, appellees correctly stress that we, as an appellate court reviewing a denial of a motion for judgment n.o.v., must review the evidence in all respects most favorable to appellees as the verdict winners. *Miller v. Checker Cab Company,* 465 Pa. 82, 348 A.2d 128 (1975). Given this limited standard of review, appellees urge us to regard the testimony of Dr. Dowling as sufficient negation of reasonable secondary causes to justify submission of the malfunction theory to the jury.

In making the foregoing argument, appellees also attempt to distinguish *Thompson.* In this regard, appellees primarily point out that they submitted no evidence of doctor negligence and in fact offered Dr. Dowling's testimony in opposition to the negligence theory. They contrast this approach to the approach of the plaintiff in *Thompson,* who did not attempt to rebut his own negligence theory and in fact himself presented evidence in support of it. Appellees also point to language in the *Thompson* opinion that describes the plaintiff's strict liability case as being one where the plaintiff's *only* proof of a defect was the occur-

rence of the malfunction. Appellees contrast their case by pointing to Dr. Dowling's testimony to the effect that since it was his opinion that there had been no doctor negligence in the use of the plaster of Paris, he would conclude that there was a defect in the plaster of Paris. This, appellees argue, is proof of a defect outside of the malfunction itself and renders appellees' case distinguishable from *Thompson*.

We find all of appellees' arguments and attempts to distinguish *Thompson* to be unavailing. They are based upon a misapprehension of the malfunction theory, apparently shared by the trial court.

There are two elements of proof in any strict product liability action. The plaintiff must prove both that the product is defective and that the defect is the legal cause of the plaintiff's injuries. *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975); *Bascelli v. Randy, Inc.*, 339 Pa.Super. 254, 260–261, 488 A.2d 1110, 1113 (1985). The malfunction theory is relevant only to the first of these elements. It addresses a situation where the plaintiff lacks direct proof of any specific defect in the product but can establish that the product malfunctioned. In such a case, the jury is permitted to infer the presence of a defect if the plaintiff proves that a malfunction of the product occurred in the absence of abnormal use or reasonable secondary causes for the malfunction.

We stress that the "absence of reasonable secondary causes" requirement does not refer to causation in the sense of proximate or legal causation. The malfunction theory plaintiff must demonstrate the absence of reasonable secondary causes for the *malfunction*, not for the injuries to the plaintiff. In other words, to satisfy the defect element of a Section 402A claim, the malfunction theory plaintiff must show that the malfunction of the product was not caused by any other factor reasonably suggested by the evidence. After satisfying this element, the plaintiff must also satisfy the second element, i.e. that the defect is the legal cause of the injuries.

This important distinction was elucidated by our Supreme Court in one of the few cases in which that Court has had an opportunity to opine on the malfunction theory. In *Kuisis v. Baldwin–Lima–Hamilton Corp.*, 457 Pa. 321, 319 A.2d 914 (1974) (plurality), the plaintiff attempted to proceed on the malfunction theory to recover for injuries sustained when the locking device of a crane failed and the crane dropped its load on plaintiff. The defendant argued that plaintiff had not demonstrated the absence of reasonable secondary causes because the crane operator had negligently left the operator's cab of the crane at the time the locking device failed. Defendant argued that this negligence was a reasonable secondary cause. *Id.*, 457 Pa. at 323, 328–30, 319 A.2d at 917, 919–20.

> The Supreme Court rejected this argument, stating: When a malfunction occurs, a concurrent abnormal use of the machine forecloses an inference of a defective condition only if the abnormal use itself contributed to the malfunction. Here, while the operator's absence from the cab might be found to be a cause of the accident, it certainly did not cause the release of the brake locking device [i.e. the malfunction].
>
> . . . .
>
> Given the occurrence of a malfunction, the operator's assumed negligence assumes legal significance only if it was a supervening cause of Kuisis' injuries.

*Id.*, 457 Pa. at 330, 319 A.2d at 920.

The *Kuisis* Court would, therefore, allow a case to proceed to the jury on the malfunction theory despite the presence in the same case of an allegation of negligence by a third party as a legal cause for the plaintiff's injuries *only* where the alleged negligence was not a possible cause of the malfunction itself. We note that in the instant case, as well as in *Thompson*, the alleged negligence consisted in conduct that contributed to the malfunction itself, as well as to the plaintiff's injuries.

■ The above-quoted language from *Kuisis* clarifies the burden of a malfunction theory plaintiff in eliminating

secondary causes of the malfunction to establish a defect. We note that the *Kuisis* Court would find that an inference of a defect is *foreclosed* where "abnormal use itself contributed to the malfunction". *Id.* We must, therefore, conclude that an inference of a defect is equally foreclosed where a reasonable secondary cause other than abnormal use itself contributes to the malfunction.

The question that arises, however, is what must a plaintiff do to sufficiently negate the possibility that reasonable secondary causes contributed to the malfunction? In the instant case, the malfunction is the overheating of the plaster of Paris to the point of burning appellee Mr. Rogers. Appellees argue that the jury here could reasonably find from the preponderance of the evidence that this malfunction was caused by a defect in the plaster of Paris. In fact, the jury here did so find, presumably by believing appellees' evidence and disbelieving appellant's evidence. In other words, appellees argue that they presented a prima facie case by presenting enough evidence to enable the jury, if it believed such evidence, to find that there were no causes other than a defect that contributed to the malfunction. This, appellees state, is sufficient despite the presence of conflicting evidence that other causes may well have contributed to the malfunction.

The trial court agreed with appellees' analysis, stating in its Opinion denying J & J's Motion for Post–Trial Relief:

> In the case before us, Plaintiffs presented evidence which, if believed, would support a verdict under the malfunction theory, i.e. would eliminate all reasonable secondary causes, in addition to establishing the malfunction itself ... Defendant presented evidence in rebuttal, which, if believed, would establish the presence of at least one reasonable secondary cause and would make the malfunction theory inapplicable, i.e. negligence on the part of either or both doctors. At that point, which evidence to believe became a jury question.

Trial Court Opinion at p. 4.

The fatal flaw in this analysis is that it leaves to the jury the determination of a pure question of law—namely, has

the plaintiff eliminated those other possible causes for the malfunction as were reasonably suggested by the evidence, thus providing an adequate ground on which the jury might base an *inference* of the existence of a defect?

The principle that this question is a matter of law which must be answered in the affirmative by the trial court before a malfunction theory strict liability action can be sent to the jury was first indicated in the plurality opinion in *Lenkiewicz v. Lange,* 242 Pa.Super. 87, 92, 363 A.2d 1172, 1175 (1976) (plurality). The principle became binding precedent upon its application in the unanimous opinion of a panel of this Court in *Thompson.*[7] In *Lenkiewicz,* the plurality opined that in a malfunction theory case, where an explanation for the malfunction which is consistent with a finding of a defect is only as probable as some other explanation arising from the evidence which is inconsistent with a finding of defect, the plaintiff has not met his burden.[8] *Id.,* 242 Pa.Superior Ct. at 91, 363 A.2d at 1175. Moreover, *Lenkiewicz* required that the trial court make this determination before the issue could be submitted to the jury. *Id.*

We agree with the analysis of the *Lenkiewicz* plurality and with the application of that analysis made in *Thompson.* Malfunction theory cases differ materially from strict product liability cases involving direct proof of a defect. In

7. We note that the *Thompson* Court mistakenly referred to the plurality opinion in *Lenkiewicz* as a majority opinion. This error, although meriting correction, in no way erodes the viability or binding nature of the *Thompson* opinion.

8. It would appear that the *Lenkiewicz* plurality somewhat confused the distinction that we have indicated must be drawn between eliminating reasonable secondary causes to prove a defect and establishing that the defect was the proximate or legal cause of the plaintiff's injuries. This may well result from the fact that in many cases involving the malfunction theory, proof of the defect will be somewhat coincident with proof of causation. This is because in eliminating other possible causes of the malfunction, a plaintiff will also be producing evidence that goes to establish the causal link between the malfunction and defect and his injuries. In a case not involving a possible supervening cause, this may be all that is necessary to establish a prima facie case as to the second element of a strict liability case, i.e. legal causation.

the latter, the plaintiff can indeed present a jury question as to the existence of a defect by producing enough evidence of a specific defect to enable a jury reasonably to find by a preponderance of the evidence that a defect in the product existed. *Johns v. Shaler Township*, 240 Pa.Super. 129, 368 A.2d 339 (1976) (en banc) (generally a plaintiff must establish each element of his cause of action by a preponderance of the evidence). In contrast, a malfunction theory plaintiff actually produces *no* evidence of a specific defect. Such a plaintiff produces evidence *only* of a malfunction. In fact, by proceeding on the malfunction theory, the plaintiff admits that it not only cannot prove a specific defect by a preponderance of the evidence, but that there is no direct evidence of a specific defect. The defect is found purely through an inference from the occurrence of the malfunction whereby proof of the malfunction is allowed as proof of the defect. *See Ocean Barge Transport Co. v. Hess Oil Virgin Islands Corp.*, 726 F.2d 121, 124 (3d Cir.1984) (evidence of malfunction is not a substitute for need to establish defect; malfunction is evidence of defect only where plaintiff eliminates all reasonable explanations for the malfunction other than existence of defect).

*Lenkiewicz* and *Thompson* merely require that a jury be foreclosed from drawing this inference of defect where the evidence is such that a jury could conclude that the malfunction was explained by some act or condition other than a defect. Stated somewhat differently, a trial court may not allow a plaintiff to use evidence of the occurrence of a malfunction as proof of a defect unless the court has first found that the malfunction cannot reasonably be said to have been caused by something other than a defect. We note that contrary to the suggestion found in the concurring opinion in *Lenkiewicz*, placing the responsibility for this decision on the trial court rather than leaving it to the jury to decide does not invade the province of the jury as the finder of fact. *Lenkiewicz*, 242 Pa.Super. at 95, 363 A.2d at 1177 (Hoffman, J., concurring). Here, the question is not which evidence to believe. We reiterate that there is no evidence of a specific defect. The question is whether

evidence of a malfunction is to be considered probative of the existence of a defect. This is a question of law.

The *Thompson* holding is the necessary corollary of the foregoing analysis. If a malfunction theory plaintiff must demonstrate that there is an absence of reasonable secondary causes in order to present a jury question as to the existence of a defect, then such a plaintiff must necessarily negate any explanation for the malfunction based on negligence by a third party which is reasonably suggested by the evidence. Where there is enough evidence that the malfunction was caused by negligence of a third party to warrant submitting a negligence cause of action against the third party to the jury, the plaintiff can not have met its burden. This conclusion rests on the standard for submission of a negligence claim to a jury, which is well-settled in Pennsylvania. To present a jury question as to negligence, there must be sufficient evidence for the jury reasonably to say that the preponderance favors liability. *Smith v. Bell Telephone Co. of Pennsylvania,* 397 Pa. 134, 153 A.2d 477 (1959). Therefore, a trial court's finding that there is sufficient evidence of negligence by third parties as a cause for a product's malfunction to make out a jury question as to negligence as a cause of the plaintiff's injuries necessarily imports that a reasonable jury could find by a preponderance of the evidence that negligence caused the malfunction. Thus, such a trial court had impliedly found that there *is* a reasonable secondary cause for the malfunction and that the inference of a defect is foreclosed.

We note that our reasoning applies equally whether the evidence that presents a jury question as to negligence is produced by the malfunction theory plaintiff or, as in this case, by the defendant. It is the presence of the evidence of a reasonable secondary cause in such a case, no matter what the source, that creates the burden on the plaintiff to negate such evidence. This is what is meant by the *Thompson* Court's statement that a malfunction theory plaintiff must eliminate all reasonable secondary causes as are fairly suggested by the evidence.

In fact, a malfunction theory plaintiff carries the same burden even in a case where the plaintiff itself has not brought a negligence action against a third party in which the plaintiff alleges that the negligence of the third party caused the malfunction and the injuries. In *Wojciechowski v. Long–Airdox Div. of Marmon Group, Inc.*, 488 F.2d 1111 (3d Cir.1973), the plaintiff brought a strict liability action against the manufacturer of a blasting device which allegedly malfunctioned, injuring plaintiff. The manufacturer brought a third party claim against the plaintiff's employer, alleging that its negligence through its servant was the cause of the malfunction and the injury to the plaintiff. *Id.* at 1112–14. Plaintiff brought no action against his employer since such action was barred by the Workmen's Compensation Act.

The *Wojciechowski* Court stated the plaintiff's burden as requiring the negation of the likelihood of other reasonable secondary causes. In *dicta,* the Court said that it doubted whether the plaintiff had satisfied that burden in that case because of the "possibility" of human intervention as a cause for the malfunction which had been raised by the defendant in support of its third-party claim. *Id.* at 1117. In deciding the actual issue in *Wojciechowski,* i.e. whether the trial court had erred in dismissing the employer-defendant because the evidence allegedly would support a finding of joint causation (malfunction due *both* to defect and negligent human intervention), the *Wojciechowski* Court concluded that there could be no such concurrent causation in a malfunction theory case. The Court reasoned that a finding that the malfunction and injury to plaintiff could have been caused by negligent human intervention would foreclose a permissible inference of defect from the occurrence of the malfunction alone. *Id.*

We draw the same conclusion today. In a case where there is sufficient evidence of negligent human intervention as a cause of the malfunction of a product to enable a trial court to conclude that an independent theory as to the cause of the plaintiff's injuries based on that negligence merits submission to the jury, the plaintiff has not sus-

tained its burden of eliminating other reasonable secondary causes for the malfunction. Thus, the malfunction theory strict liability claim of such a plaintiff must fail in that he has failed to present a jury question as to the existence of a defect which is an essential element of his cause of action. *Berkebile, supra.*

We caution that we are not deciding that a mere scintilla of evidence of negligence by a third party will suffice to defeat a malfunction theory plaintiff's claim. Our decision in this case does not enable defendants in strict liability malfunction theory cases to obtain directed verdicts merely by introducing evidence, no matter how little, of a reasonable secondary cause. Our decision allows such a defendant to defeat the claim only where there is sufficient evidence of a reasonable secondary cause to present a jury question as to whether that cause itself resulted in the malfunction and the plaintiff's injury.

■ Applying these principles to the instant case, we find that the trial court erred in submitting appellees' malfunction theory strict liability claim to the jury in the presence of sufficient evidence of negligence as a cause of the malfunction to warrant submission of appellees' negligence theory to the jury. We are not persuaded that appellees' production of Dr. Dowling's testimony as to the absence of reasonable secondary causes was a sufficient elimination of such causes, as is evidenced by the trial court's determination that, even considering this testimony, a jury question as to doctor negligence had been presented. Moreover, we are not persuaded that *Thompson* is inapplicable because of the presence in the instant case of Dr. Dowling's statement that because in his opinion there had been no doctor negligence, the malfunction was caused by a defect in the plaster of Paris. This statement does not constitute independent *proof* of a specific defect. In fact, on cross-examination Dr. Dowling admitted that he could not identify any specific defect in the plaster of Paris. Dr. Dowling's statement was nothing more than a conclusion that absent reasonable secondary causes, in his opinion, the only other possible cause of the malfunction was some kind of defect.

(R. 524). This is certainly not proof of a specific defect and does not distinguish this case from *Thompson*.[9]

Since we have demonstrated our concurrence with the rationale underlying *Thompson* and with its holding and since we have determined that it is legally indistinguishable from the instant case and concluded that the trial court here erred in submitting appellees' malfunction theory strict liability claim to the jury, the jury's verdict based solely on that theory must not be permitted to stand. However, we cannot accept J & J's argument that we must accomplish this end by granting judgment n.o.v. in J & J's favor. Under the peculiar circumstances of this case, we view that such a disposition would work a substantial injustice to appellees.

If we were to grant judgment n.o.v., we would leave appellees completely without a remedy, despite the fact that none of appellees' causes of action other than their malfunction theory strict liability action were ever expressly decided by the jury. As we have earlier stated, the construction of the Verdict Form in this case coupled with the trial court's instructions thereon resulted in the jury ceasing its deliberations as to liability questions immediately upon finding liability under the malfunction theory. The jury then proceeded to award damages. Although as we have stated, the verdict can be interpreted as being not only against J & J but also for the hospital defendants, this jury clearly never decided either appellees' failure to warn strict liability claim or their negligence claim against J & J.

J & J argues that appellees are deserving of this harsh result because they advocated the use of the Verdict Form and, therefore, must accept the consequences of its use. We, on the other hand, are constrained to avoid an unneces-

---

**9.** Appellee's brief also makes passing reference to evidence they presented regarding a similar burning incident involving plaster of Paris which appellees sought, over J & J's objection, to use to show a defect in the plaster of Paris. In support of J & J's alternative motion for a new trial, J & J has alleged on appeal that the admission of this evidence was in error. We note that this evidence was admitted *only* in support of appellees' failure to warn theory and their negligence theory against J & J, and *not* in support of their malfunction theory.

sarily harsh result whenever we can do so without doing violence to the applicable law.[10] In this case, we consider the grant of a new trial to be the most equitable disposition. Granting a new trial both acknowledges the applicability of *Thompson* to this case [11] and rectifies the error of the trial court which gave rise to the malfunction theory verdict against J & J. It also permits appellees to obtain a jury's decision on those of appellees' claims which retain viability in light of this opinion. In light of this disposition, we need , not consider J & J's remaining contentions on appeal, all of which are made in support of J & J's alternative request for a new trial.

The judgment of the trial court is reversed and a new trial to be conducted in a manner consistent with this Opinion is hereby ordered.

---

**10.** We note that the *Thompson* Court was not faced with a similar difficulty since in that case, unlike here, the jury had returned an independent verdict based on the plaintiff's negligence of the crane operator theory. The *Thompson* Court's decision that judgment n.o.v. was warranted as to the malfunction theory strict liability claim did not affect the negligence verdict, which the Court allowed to stand. *Thompson*, 325 Pa.Super. at 394–96, 473 A.2d at 125–6.

**11.** *Thompson* was decided three days after the completion of the trial in this case. Nevertheless, changes in decisional law are applicable to cases in litigation at the time of the change. *McCloskey v. Workmen's Compensation Appeal Board*, 501 Pa. 93, 98 n. 3, 460 A.2d 237, 239 n. 3 (1983).